Damages. And it is our contention that the jury should not have been permitted to award damages based on the purchase price of this punch press. The simple reason being there was absolutely no evidence from which the jury could determine the value of the punch press at the time of its delivery. That's the key, isn't it? At the time. Absolutely, Your Honor. The testimony was it was worth zero some number of months later. Four and a half years later, Your Honor. But then doesn't, I mean, the problem I have with your argument on your main appeal is simply this. It seems like the question of the timing of when it was worth, you know, worthless or wasn't up to par, that kind of goes to the weight of the testimony. I don't see that that makes their testimony inadmissible. If they submitted testimony this thing didn't work, and I think a jury, it's within the normal province of a jury to make a decision on the jury instructions, what was the value of it when received. There's no challenge to the jury instructions on that point, right? Correct. The jury was instructed that for damages they had to take a difference between what was paid and the value of it when received, basically. Correct. And so it seems to me, as just one member of the panel, that this is admissible evidence, and the arguments about timing go to weight, but they're not a basis to throw out the verdict. Well, that is certain. Tell me where I'm wrong in that. Well, you're wrong, Your Honor, because a jury requires greater guidance before it can place a value on this complicated piece of machinery than simply testimony that it didn't work well. I, and I'm somewhat embarrassed to say, but I'm willing to take help from the Court. The Court directed several cases to our attention in anticipation for oral argument, cases that were cited in our briefs. One of those cases was State v. Hawkins Hawkins, an Oregon Supreme Court case dealing with the very statute we're concerned with here. I can't find a difference between Hawkins and our case. Hawkins involved the sale of some materials. There was that for highway building. Those materials, there was evidence those materials were defective. There was evidence of what those materials cost. There was no evidence of what their value was in their defective condition. Just no evidence. The Oregon Supreme Court reversed a verdict and directed entry of judgment for the seller on, well, reversed the verdict. It was a, the action was by the seller for the purchase price. The buyer said that the products were defective. And because there was no evidence at all of the, of the value of the defective materials, the Supreme Court reversed the jury's verdict that the materials were only worth something less than their full purchase price. I see value. Value to whom? Value. I'll tell you why. It seems to me that the whole case involves the recipient of these, of this machine saying to us it was worthless. It was, the value was zero and we paid a whole bunch of money for nothing. And why isn't that enough to say you get the whole purchase price? Because that's, that isn't evidence from which a jury can decide what the market value. That's why I say market value? Yes. What do you do with Vista St. Clair? There's some language in there that says, I'm sure you saw this, in a few cases courts have found or allowed the jury to find that the value of accepted goods was zero and permitted the buyer to recover the purchase price. Right. And Vista St. Clair doesn't say what kind of evidence would have been sufficient to permit the jury to get to that. Well, it does because it talks about the testimony of the apartment owner saying I had this carpet, I went through and it was, you know, we got, it was water stained or whatever, we couldn't clean it and so on and so forth. That was the evidence that the court recited in its opinion. There were two pieces of evidence in Vista St. Clair. One was the owner's testimony as to the value of the carpeting nine months after installation. Yeah, which was zero. Right. He said, yeah, I think it's essentially worthless to us or something like that. It's zero. Okay. Zero. And the trial court awarded actually some much greater value than zero. So there was that. Excuse me? $2,500 against the purchase price. Right. So effectively finding it was really worth about $6,000 as installed rather than the $8,500 that it cost. Also in Vista St. Clair, there was testimony of the cost of repair essentially, replacement, what it cost to put in new carpeting, which the court said is admissible evidence. No such evidence in this case. There was no evidence of cost of repair or replacement. There was no evidence of the value of the machine at any time, even near its time of delivery. The only evidence, again, four and a half years later for a $250,000 industrial machine that had been used during that time and frequently misused, according to the evidence that was presented. In, I mean, I cite a couple of, you know, the auto accident is always the sort of basic case you can go to in any instance. In a couple, in two cases I cite in my brief, Oregon Court of Appeals and the Oregon that were done, they were reasonable, they were necessary. That's not enough. You still have to give the jury a figure. And a car is something many of us drive, many of us have purchased and sold, many of us are familiar with, juries are familiar with the value generally. And the court said, no, that's not enough. It's not enough to say it was wrecked, it was ruined, it was destroyed. You have to say this was the diminishing in value. The car is, okay, let's take this. This is an industrial machine for a specific purpose. Yes, Your Honor. And my understanding is they paid, what, about $300,000? It was about $248,000 was the purchase price. Before interest. Okay, so they get the machine and their position in the testimony was that they couldn't make it operate to produce the product that they intended it for, correct? Right. I mean, we They tried to work with it over an extended period of time. Correct. And they put before the jury, did they not put in information about tool alignment devices and specialized rings that they had to get and some customer charging them for reworking plates that they Yes, they did. And those were under their consequential damages theory, which were not challenging. They did present adequate evidence to support their claim. Your theory is what they should have done was what thing? Because there was a lot of talk in this about mitigation. They basically had a right to send it back within the first year, and you were willing to give them back the $54,000 that they paid on the installment, correct? Correct. Okay, but there was also in the purchase order the opportunity to return it at any time at your expense if it was defective. Correct. Okay. And so that's why I get a little confused. It seems to come through as they were trying to make it work. You said that they should have returned it within the first year because no questions asked and get their money back. They kept it for three or four years, and therefore what? Well They got some value out of it that should take away from the original purchase price? In other words, why isn't there evidence in the record to say this machine they got from the get-go wasn't what they paid for? They weren't getting anything out of it. They weren't able to use it productively in their business. So why is it at the purchase price plus these incidental items? Well, they were using it, Your Honor. It didn't work to their satisfaction. There's evidence of that. But there's also evidence they were using it for production. They were turning out jobs. It wasn't as if the thing never worked, never turned on. You know, and I mean, just by, it's a small point, but it sort of goes to show they didn't really think about maybe their theory of the case. I mean, Mr. Combs testified, he actually didn't testify the machine was worthless. He testified it had $700 or $800 of scrap value. So their theory seems to be that it appreciated in value. It was worthless. And they asked the jury to find it was worthless when they purchased it and when it was delivered. That's a quibble, saying it was worthless and then it didn't happen. Well, it's a, I, Your Honor, yes, it's a quibble, except that this, when we're being asked to believe that this was their evidence. Our theory of the case was that this was worthless. And the way we went about proving it was not by having anybody say it was worthless. It went to a jury and you got to argue it had value to them. So, I mean, this just seems like routine jury material that a jury makes a decision on. I don't see where the beef is on that. Well, it's, perhaps we can agree to disagree. I can't say. I can't say they had to frame a witness, had to say the value at date of delivery was X. Right. And they didn't do that. They presented nothing from which the jury could conclude. It's just that from day one, we couldn't use this damn thing. It's not worth anything to us or it's not worth much or it's scrap or whatever. And they didn't even say that. Well, how would they prove it on the date of delivery? In other words, I get, if auto wreck is a fait accompli, you've got the wrecked auto. This is a new machine, which they're trying to make work over a period of time. So what does date of delivery got to do with the value? The value, presumably, at some level, was what they paid for it. Well, the date of delivery is significant because that's what the statute compels us to look at. How would they prove it? In other words, what should their proof have been, that they knew the day they got it, it didn't have any value to it? Well, they didn't have to know on that date, but what they can show is that as delivered, it could do this, it couldn't do this. Therefore, what it was really worth to us was X. Which would be, we bought it to manufacture these thicker metal kind of devices, which it didn't do. It didn't do? There's some residual other kind of work. There's no evidence, or you're saying there should have been evidence, that there were other kinds of fabrication they could have done that would have been within the tolerances and limits of the machine, and then that would offset against the fact that they couldn't make what they really bought it for. Absolutely, Your Honor. It's not as though this was, you know, there's one pile of evidence that this thing never worked, couldn't do anything, was completely worthless. In fact, there's competing evidence. It could do a lot of things. It couldn't do some. Some it did sometimes, and some it did the other. And so we have a spectrum between $248,000 and zero that a jury was asked to place a value on about something that, in all due respect to the jury, they would have no way to value. So how did you handle this at the trial court level? What was the nature of the objection made and what did the trial court rule on the issue that you're bringing to us right now? It was a motion. It was phrased as a motion for a judgment as a matter of law to withdraw that claim, the claim based on damages related to the purchase price of the machine under 772-7140. Like at the close of the plaintiff's evidence? Correct. At the close of the plaintiff's, and then renewed. So you have to say no rational jury could find this damage? Yes. And it was renewed by post-trial. By the way, are you going to address the cross-appeal at some time? First, I want to know what was the district court's answer to that. The district court's answer was they put on evidence that didn't work very well. The jury could infer that it was worthless. The only way you can really tell about the value when you've got the darn thing is what it does or doesn't do downstream, right? Correct. And they testified to us it was worthless. It didn't do what we bought it for. They testified that four and a half years later it was worthless. Yes. How about the cross-appeal? The cross-appeal, first of all, the cross-appeal is moot. In the first trial, and, of course, this case has been tried twice, the first trial, the plaintiff had a variety of theories. One was breach of express warranty. Another was fraud. The fraud and the breach of express warranty theories were based on identical alleged misrepresentations. Could you have different representations that were fraud in the inducement? I mean, could you have fraud in the inducement of a contract based on fraudulent misrepresentations that weren't warranties of an agreement? Are you just saying that theory wasn't presented? Not in this case. No. Their theory was it just incorporated the exact same misrepresentations for both theories. Both were, you know, this was what we were told about the machine and it was false. I mean, it was. But they found there wasn't an express warranty. Is that saying that's the same elements as fraud? It is. In fact, fraud is, of course, harder to prove. It's a clear and convincing evidence. There's an element of intent that's not part of a claim for express warranty. And when the at the conclusion of the case, Judge Gelderk's noted, wow, this just confirms my belief and my decision to grant judgment as a matter of law against the fraud claim because, jury, you found that there was no breach of express warranty. There were no misrepresentations of fact that were part of this agreement. And so for that reason, it can be affirmed as well as the fact that there was simply insufficient evidence to get to the jury. There was testimony, was there not, though, from the BC Metals folks that they asked a whole bunch of questions about the machine. They wanted to see it producing the materials in Germany, but they didn't have, in fact, the right thickness. So it wasn't as if they simply looked at the brochures and didn't ask any questions. Is that correct? Yeah, they went and saw the machine in Germany. They went and watched it. They visited Heiko's factory. They asked questions of the people who were showing them and explaining the machine to them, correct? They asked some questions. I believe the testimony was that they did not at that time ask questions about the thickness of material that this machine would punch. I think they said they maybe asked those questions later. Do you want to reserve some time? I would very much, Your Honor. Thank you. Thank you. May it please the Court, Phil Chadsee, appearing on behalf of BC Metals, the plaintiff and respondent in this case. This case was tried from the outset on the theory that there's a failure of consideration because the machine was worthless. It was delivered in May, and the technician came over from Belgium to install the machine. He was supposed to be there one week. He spent two weeks there trying to make changes in the machine, the computer system of the machine, to convert it from metric to English. At the end of two weeks, he left, not because it was fixed at that time, but because he wanted to go home to holiday, and he was not getting the changes out of Belgium that he needed to change the computer. Somebody bought this machine expecting to use it in an English context, and it was set for metric, and nobody knew that until it showed up. That's right, Your Honor. Okay. Yeah. And the brochure indicates it's supposed to punch one-quarter inch material as well as the metric. So they sent it over, and they apparently never – this was the first machine ever sold into the United States. Apparently, they'd sold one into Canada, but Canada uses a metric system, so this was the first one. Anyway, he left after one week. The machine was not working at that time properly, and left it up to their dealer technician to take care of it. Well, the dealer technician, this was new to him. He had never worked on a machine before, and he was being trained by the technician from Belgium. For the next nine months, the machine had all kinds of problems, continued to have problems with the – Did it ever do any – I hear the other side saying, yeah, but during all this time, it did do some things that were worth something to you. There's no evidence of that, Your Honor. Absolutely no evidence in the case. In fact, the major customer had – needed to punch three-sixteenths inch material. It was supposed to punch one-quarter inch material. When they started to do that, the machine vibrated so badly that they couldn't punch the three-sixteenths inch material. Had to stop it. At the end – if you look at the exhibits, the trial exhibits in this case, about 80 out of the first 100 exhibits of the plaintiffs are communications about all the problems they had in the first nine months. Then, at the end of nine months, there's a letter that was sent by Mr. Kham, the president of the company, to HACO listing all the problems and asking what they intended to do about the problems. And their response was, basically, don't bother us. We didn't sell the machine. Deal with our dealer here in the United States. Then, after that, the dealer came – comes back and writes a letter to the board of directors of HACO saying, hey, you really ought to do something about this machine because the customer is having a lot of problems with it. At that point, HACO sends another technician, and he spends a week on trying to fix the problems. At the end of that week, he's still not able to fix all the problems. And shortly thereafter, the major problem arises, and that is the fact that you have a punch head and a die that need to line up. So if you're punching anything but circles, it's important that those things line up. You're punching, say, squares, and you have it cocked this way and this way. When it comes down through the metal, it will break the die and cause a piece of metal to fly off into the environment. At that point, they couldn't operate it anymore except to punch circles. And so at that point, basically, they stopped using the machine. So why did they hang on to it? Under the purchase order, regardless of whether there was this one-year deal, the purchase order provided that you could reject it any time and return it. Well, the simple answer to that, this is a machine that is about 16 feet one way, 20 feet the other way, is 8 feet high, and weighs about 7 tons. Take it to the package store, and they'll send it in. You're right. You don't take it to Federal Express to ship it back to Belgium. Well, but it's at their expense. That's what I don't understand. But the buyer may reject it. But remember, if you look at Exhibit 45, which is Supplemental ER-20, HACO at this point is washing its hands of the machine, saying we don't have anything to do with this machine. No reasonable buyer is going to spend hundreds, literally thousands of dollars, to pack up a machine and send it back to somebody that's going to say they're not going to accept it.  No, but there was a letter saying what you intend to do about correcting the machine. So for what, four and a half years, this multi-ton monster sits there? Exactly. What ever happened to it? Well, eventually, during the course of the litigation, HACO, two and a half, three years into the litigation, finally sends another technician to look at the machine. He spends two days changing out all the computer boards in it. Then they run the test that is going to show that there's nothing wrong with the machine, and on three-sixteenths of an inch material. And that test, as they're running the machine, it punches the holes, and finally it knocks out a tool onto the top of the plate. HACO then closes the test down, and that's the end of the machine. So it's basically sat there for HACO to operate it. And that exhibit is 107, if you want to look at it, which shows. There's no claim on this for rent, I take it. What? You're not charging them for. No, we didn't charge them for rent. I mean, it's part of a big warehouse. Oh, so. It's a big warehouse. Eventually. Did somebody sell it for scrap? I mean, what ever happened to it? Well, the problem was, in the testimony, is that it cost more to load the machine onto a truck than the price of scrap. That's Mr. Comp's testimony, page 150, volume four. So that sums up your view that this thing was worth the sale. It had a negative value. We knocked on the door, and we never got any value out of it at all. That's right. It had a negative value. Now, let me turn my attention to the fraud claim, because we do have promissory fraud in this claim. HACO put out a brochure, which is exhibit 55, and you have it in there, that states, basically, it will punch at certain speeds. And the only speed in there in the brochure that has a pitch, and the pitch is the distance from the center of one hole to the center of the other, is at a 30 millimeter pitch. It will punch at 240 strokes per minute. But aren't there different representations as to the same thing in this case, in terms of the specifications of the machine and what it will and what it won't do? Well, that's the brochure. Right. In the proposal that they sent to it, the only figure they used for a punching speed is at 240. Is that different? That's the same speed as in the brochure. But the difference is, the brochure was printed for a trade show in Milan, which they had a prototype at Milan. After that trade show, they changed the punching speed and lowered the punching speed. And HACO knew that and did not change the brochure. But your client is sophisticated. It's not like a consumer getting sold something on the phone by a telemarketer. It's a sophisticated company, and it's buying a complicated piece of equipment for hundreds of thousands of dollars to manufacture goods. It knows exactly what it needs. So, I mean, if it needed a certain speed, wouldn't it have negotiated for what the speed would be with particular thickness of metal? I mean, this speed that something punches at is different depending on what you're running through the machine, right? No. The speed is governed by a camshaft. Well, the speed that the machine could turn on its own. But once you start fabricating something in it, doesn't it depend whether you're trying to punch holes in paper or steel? No, it does not. The machine head is governed by a camshaft, so that's a constant speed. The only variable is the distance of the pitch, how far it is from this hole to this hole. If the distances are too far apart, then it has to go twice around the camshaft. So we could not negotiate. All we could do is rely upon what they said the speed was, which was 240 at a 30-millimeter pitch. In fact, the speed at a 30-millimeter pitch is considerably less than that. It's down around 150. So it's a major difference in the speed. Did your contract specify it was for a 30-millimeter pitch? No. What the contract, the brochure says 240, 30 millimeters. The only speed in the proposal is 240. That's the only speed at all. The problem I'm having is I agree that, with your position on the main appeal, that the jury had evidence to find damages, but this does not seem like a fraud case to me under traditional standards. Well, I think it is. It seems like a rather routine business dispute where, you know, somebody does business with a foreign supplier and something gets lost in the translation. They don't make their needs met specifically, or one side or the other falls down, either your client or them. It seems like it's a breach of contract, but if how you could say it's a fraud, I'm having trouble with. Well, first of all, you have the brochure that states the speed. You have the proposal that states the speed. But why is that fraud? In between. Why is that fraud? It's fraud because, in between, they changed the speed. After the Milan demonstration. What differentiates, in your mind, fraud and just screw-ups? Well, they knew. They knew after the Milan thing, and they changed the speed, that the speed in the brochure was not 240. You couldn't do it. They deliberately sold you a product knowing that it wouldn't work. If your client thought that, I'd like to hear your answer to Judge Strout's question, actually. Then I've got to follow up. Okay. I don't think they sold us a material that knowingly wouldn't work, but they sold one that they knew knowingly would not punch a 240 at 30 millimeter pitch. There's no doubt about that. Now, the way your client, it seems like, for quite a period of time after getting the machine, worked with HACO trying to get some kind of fix. Well, they did. They pointed out to HACO. Is that behavior consistent with saying that you infer that they were trying to defraud you? No. What our client said is they brought to HACO's attention that this won't punch at this speed. And at that point, that was the point where they sent the letter and saying that it won't punch at this speed. They sent another technician over. And after that other technician came over the second time a year later after the purchase, that other technicians told us it will not punch at that speed. It's not designed to. That doesn't sound like fraud. You know, they're sending technicians. People are trying to fix it. It's metric. It's English. It just doesn't sound like fraud. It sounds like a product. Well, I guess when somebody knows that the speed that's represented in a brochure is not the correct speed and the speed represented in the proposal is not the correct speed, because they have changed that speed in the design, it seems to me it is. If you represent an automobile will go 70 miles an hour, and in fact, you know that there's a governor on the automobile and it won't go more than 50 miles an hour, and you sell it on the basis it will go 70, it seems to me that's fraud. What did they actually try to find out beyond the brochure? Were they passive in this? Judge Gould has mentioned they're sophisticated buyers, so why didn't they try to wrestle this to the ground? Because they went over to Germany to see this, didn't they, and they didn't have what they wanted, so why didn't they wrestle this to the ground in writing? Well, first of all, in Germany they were punching all kinds of things at different speeds and different pitches. And our people weren't doing it, they were just observing what they were doing. I understand. They wanted to see the thicker material. Yes. They didn't get to see it. They didn't see the thicker material. This part doesn't have to do with the thickness of the material. This part has to do with the pitch. The difference, the hit speed, from center hole to center hole, and unless you're saying I want to, you know, demonstration to see how fast it will go at 30 millimeters, pitch, you're not going to have... Is your theory then that they knew between Milan and the time they delivered on this deal that they had changed the speed on the machine, and that's the withholding of information, and doesn't depend at all on any further inquiries from the BC Metals people? That's right, except after it was delivered, then we discovered the speed was wrong. So we had no way of knowing that before it was delivered. Do you think there's justifiable reliance on a brochure in this kind of context, buying this kind of equipment for a specialized need? Well, that's the only thing a buyer has to rely upon are the specifications for the machine. Those are very detailed specifications. Otherwise, I don't know what a buyer would rely upon other than specifications, and certainly the proposal confirmed that speed. And we have this document in there from the designer saying you can't do it at that speed. Do you have anything else you'd like to say in the time remaining? No, I do not, Your Honor. I'll reserve this for rebuttal, I guess, on that issue if there's any need for it. There's only one point I want to make on rebuttal. There was a question about whether there were inconsistent items of information that came to BC Metal, and there were. I discussed that at pages 22 and 23 of HACO's red brief. In summary, this initial promotional brochure said the machine had a speed, maximum speed of either 300 or 540, depending on which setting. And that brochure said we change these specs all the time. It said it right at the bottom. They change. Then a particular proposal was prepared for this transaction, prepared by SCA, the company, the distributor. It said the machine's maximum speed was 200-400, not 300-540. So inconsistent, and in fact that 200-400 was, in fact, the speed of this machine. It was accurate, and there's no dispute about that. There's this other speed, the punching speed, the speed at which you actually punch holes as you move this sheet around. And the proposal, again, at sub-ER-6, says the number of strokes per minute depends on sheet thickness and center distance, which, of course, makes sense. The bigger and heavier the sheet and the farther between holes, the slower it's going to be. The lighter the sheet, the closer. They made that, it said right there. It depends. And your point with this information is what? My point is, is that, again, there was no justifiable reliance, because here's the information, most of which in the proposal is exactly accurate, all of it in the proposal exactly accurate, and consequently, that's why Judge Gelderk said this isn't a fraud case and dismissed it. Thank you, Your Honor. Counsel, you wanted to make or say something else? I would just call the Court's attention. The document I'm talking about where they changed the speeds is supplemental ER-89. And if you look at that, compare that to the specifications, the specifications, the only one that has a punching speed at all is the 240. The 200 and 400 is actually for a different machine completely. And the hit speed of 540 is the only other speed stated here. And the evidence on that is, of course, that they sent a letter before that. They invite the people over saying the hit speed is now 560, which is 20 hits higher. Thank you. All right. Thank you, Counsel. The case has started. It's ordered and submitted. We'll take a 10-minute recess. All rise. Thank you. Thank you. Next we'll have Rachel.
judges: Trott, Fisher, Gould